# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | | |
|---|---|---|
| STARR SURPLUS LINES INSURANCE COMPANY, *as subrogee to AdvancePierre Foods, Inc.*, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 2:18-cv-00067-JDL |
| MOUNTAIRE FARMS INC., | ) ) ) | |
| Defendant. | ) | |

## ORDER ON DEFENDANT'S MOTION TO DISMISS

The Plaintiff, Starr Surplus Lines Insurance Company ("Starr"), asserts that Mountaire Farms Inc. ("Mountaire") delivered raw chicken products contaminated with Salmonella bacteria to AdvancePierre Foods, Inc. ("AP") that resulted in a recall of more than 1,700,000 pounds of AP's product and an insurance payout of ten million dollars by Starr to AP. Starr, as subrogee, seeks repayment of the amount paid under the insurance policy. In its Complaint, Starr brings claims for breach of the implied warranty of merchantability, 11 M.R.S.A. § 2-314 (2018) (Count I), breach of the implied warranty of fitness for a particular purpose, 11 M.R.S.A. § 2-315 (2018) (Count II), and a claim for strict liability, 14 M.R.S.A. § 221 (2018) (Count III). Mountaire has moved to dismiss Starr's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted (ECF No. 18). For the reasons that follow, I grant the Motion.

## I. FACTUAL BACKGROUND

The following factual allegations from the Complaint are accepted as true for the purposes of the Motion to Dismiss.

AP uses raw chicken parts at its Portland facility to create ready-to-cook chicken dishes for retail. In 2014, Mountaire contracted with AP to deliver raw chicken parts to AP throughout 2015. In February 2015, Mountaire shipped approximately 120,000 pounds of fresh, boneless chicken breasts to AP's Portland facility. Soon thereafter, individuals in Minnesota and Wisconsin became infected with *Salmonella Enteritidis* ("Salmonella"), which was reported to the United States Food Safety Inspection Service ("FSIS"). The FSIS linked the illnesses to AP's raw chicken and issued a public health alert on July 1, 2015, leading AP to initiate a recall that eventually included 1,707,494 pounds of raw chicken product. As a result of the recall, AP sustained losses in excess of ten million dollars, including damages resulting from "the return and destruction of the recalled chicken products, lost sales opportunities, loss of business, and loss of customers." ECF No. 1-3 at ¶ 20. AP used its computer system to trace the source of the Salmonella to two truckloads of raw chicken parts it had received from Mountaire in February 2015. AP submitted an insurance claim to Starr under a Starr Response Product Contamination Policy for damages sustained in connection with the recall. Pursuant to the insurance policy, Starr paid AP ten million dollars, the policy limit. Starr now brings this subrogation action to recover all payments it made to AP associated with the product recall.

## II. STANDARD OF REVIEW

Mountaire moves to dismiss the Complaint for failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the Complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013) (internal quotation marks omitted). In evaluating a motion to dismiss, the Court will accept well-pleaded facts as true and draw all reasonable inferences in the Plaintiff's favor. *Id.* at 52-53. Determining the plausibility of a claim is a context-specific task that requires the court "to draw on its judicial experience and common sense." *Id.* at 53 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## III. DISCUSSION

Mountaire makes four arguments for dismissal: (1) all of Starr's claims fail because Salmonella is an inherent and recognized characteristic of raw chicken; (2) Starr's strict liability claim is barred by the economic loss doctrine; (3) AP's contract with Mountaire waives all prior warranties, including the implied warranties of merchantability and fitness for a particular purpose; and (4) Starr's claims are preempted under the Poultry Products Inspection Act ("PPIA"), 21 U.S.C.A. § 451, *et seq.* (2018). I address Mountaire's first two arguments. Finding these determinative, I do not address the contractual waiver or preemption arguments.

### A. Salmonella as a Product Defect

Mountaire alleges that Starr's claims for breach of merchantability, breach of fitness for a particular purpose, and strict liability all fail because it is widely known that Salmonella is inherent in raw chicken and is eliminated through cooking. As such, Mountaire argues, Salmonella cannot render the chicken "defective," "unfit for its particular purpose," or "unreasonably dangerous," which are the essential elements of each of Starr's claims, respectively.[1]

There are two tests that the Maine Law Court has applied when faced with a defective food product claim. The traditional test, called the "foreign-natural test," provides that a food manufacturer cannot be strictly liable for supplying a product with natural ingredients that is free of foreign ingredients. *See Kobeckis v. Budzko*, 225 A.2d 418, 423 (Me. 1967) (holding that pork seller did not breach implied warranty of fitness for a particular purpose because the injury-causing trichinae was a "natural" rather than "foreign" attribute of raw pork). In *Estate of Pinkham v. Cargill, Inc.*, the Law Court rejected the foreign-natural test in the context of food strict liability claims, instead adopting the "reasonable expectations test." 55 A.3d 1, 5 (Me. 2012). "The reasonable expectation test provides that, regardless whether a substance in a food product is natural to an ingredient thereof, liability will lie for

---

[1] Under Maine law, to prevail on its claim for breach of the implied warranty of merchantability, Starr must show that (1) Mountaire is a merchant of raw chicken products; (2) the raw chicken was defective; and (3) the defect caused the plaintiff's damages. *Acadia Ins. Co. v. Fluid Mgmt., Inc.*, No. 2:15-cv-00008-JAW, 2015 WL 3869696, at *7-8 (D. Me. June 23, 2015). To prevail on its claim for breach of the implied warranty of fitness for a particular purpose, Starr must show that (1) it relied upon Mountaire's skill and judgment; (2) it made known to Mountaire that it wanted chicken to create raw products; (3) the raw chicken was not reasonably fit for such purpose; and (4) that it incurred damages from breach of the implied warranty. *Ross v. Diamond Match Co.*, 102 A.2d 858, 859 (Me. 1953). Finally, Maine's strict liability statute states that "one who sells any goods or products in a defective condition unreasonably dangerous to the user . . . is subject to liability for [ensuing] physical harm . . . ." 14 M.R.S.A. § 221 (2018).

injuries caused by the substance where the consumer of the product would not reasonably have expected to find the substance in the product." *Id.* (quoting *Jackson v. Nestle–Beich, Inc.*, 589 N.E.2d 547, 548 (Ill. 1992)).

*Cargill* involved a consumer who was seriously injured after eating a turkey sandwich with pieces of bone in the turkey. *Id.* at 3. Applying the reasonable expectations test, the Law Court concluded that whether the average consumer would reasonably expect to find a bone in turkey meat, and therefore whether the processed turkey was defective, were disputed questions of fact that precluded summary judgment. *Id.* at 7. *Cargill* did not expressly address warranty claims and thus it is unclear whether the reasonable expectation test adopted in *Cargill* also applies to warranty claims, or whether the foreign-natural test adopted more than forty years earlier by *Kobeckis* still applies to warranty claims. It is unnecessary, however, to determine which test controls under current Maine law to decide the motion to dismiss in this case because Mountaire prevails under either test.

Applying the more demanding reasonable expectation test to the facts alleged in Starr's Complaint, an average consumer—and certainly a sophisticated commercial consumer such as AP, Starr's subrogor—should reasonably expect that raw, uncooked chicken is not safe for human consumption. Although the Law Court noted in *Cargill* that "whether a consumer would reasonably expect to find a particular item in a food product is normally a question of fact that is left to a jury," 55 A.3d at 7, the reasonable expectations of AP can be determined as a matter of law because, as recognized by numerous courts, it is commonly known that Salmonella

5

occurs naturally in chicken and that raw chicken can only be safely consumed after it is cooked at high temperatures:

> [P]eople have been cooking and eating poultry for hundreds of years, presumably without knowing the exact temperature and amount of cooking time required to eliminate salmonella bacteria which may be present in the meat. Even without such knowledge, salmonella food poisoning has not proven to be the natural consequence of consuming poultry. We thus think it is common knowledge that there is a danger of illness from eating poultry which has not been properly prepared.

*Leno v. Ehli*, 339 N.W.2d 92, 99 (N.D. 1983); s*ee also González Cabán v. JR Seafood*, 132 F. Supp. 3d 274, 287 (D.P.R. 2015) (noting Salmonella is "natural" material in chicken); *Texas Food Indus. Ass'n v. Espy*, 870 F. Supp. 143, 148 (W.D. Tex. 1994) ("[O]rdinary methods of cooking and preparing food kills the *Salmonella* pathogen.") (discussing *American Public Health Assoc. v. Butz*, 511 F.2d 331, 334 (5th Cir. 1975)); *Supreme Beef Processors, Inc. v. U.S. Dep't of Agric.*, 275 F.3d 432, 439 (5th Cir. 2001) ("[N]ormal cooking practices for meat and poultry destroy the *Salmonella* organism. . . .").

In *Craten v. Foster Poultry Farms Inc.*, a recent decision in which, as here, chicken containing Salmonella was linked to human illness, the District of Arizona dismissed the plaintiffs' strict liability and implied warranty claims, noting that "[i]t is undisputed that Salmonella occurs naturally in chicken and that the bacteria are killed through proper cooking . . . which is how raw chicken products are intended to be used." 305 F. Supp. 3d 1051, 1064 (D. Ariz. 2018). Applying, in part, the reasonable expectation test, the Court found that the strict liability and warranty claims "fail[ed] as a matter of law because Salmonella is natural to poultry, killed through proper cooking, *and because no poultry processor or reasonable consumer*

6

*expects raw, improperly cooked, or improperly handled chicken to be safe for consumption." Id.* (emphasis added). As in *Craten*, the application of the reasonable expectation test to the allegations of the Complaint requires the dismissal of Starr's claims.

Starr's claims likewise fail under the foreign-natural test, which "provides there is no liability if the food product is natural to the ingredients." *Cargill*, 55 A.3d at 5 (quoting *Newton v. Standard Candy Co.*, No. 8:06CV242, 2008 WL 752599, at *2 (D. Neb. Mar. 19, 2008)). Just as in *Kobeckis*, which held that "live trichinar in raw pork and raw pork products is [a] . . . natural . . . attribute of pork" and there was therefore no seller liability if the pork was safe for consumption when properly cooked, 225 A.2d at 423, there is no liability for Salmonella, which is natural to raw chicken and destroyed when properly cooked (*see* collected cases, *supra*).

Accordingly, Starr's claims cannot succeed under either the reasonable expectation or foreign-natural test.[2] Even if, however, Starr's strict liability claim could survive these tests, it is further barred by the economic loss doctrine.

## B. Economic Loss Doctrine

Mountaire further alleges that the economic loss doctrine bars Starr's strict liability claim because Starr only alleges economic harm to AP's raw chicken product

---

[2] Starr argues that it has not merely alleged that Mountaire sold chicken containing Salmonella, but that Mountaire sold chicken that contained Salmonella and was also linked to human illness, which renders the chicken "adulterated" as that term is defined by the PPIA. *See* 21 U.S.C.A. §§ 453, 458. If Mountaire sold adulterated chicken (which is prohibited by the PPIA), Starr argues, it would be liable under both strict liability and breach of warranties theories. *See* ECF No. 19 at 2-3. Although the parties dispute whether the PPIA's definition of an adulterated product can apply to the products at issue here and, if they do, whether liability can attach to Mountaire, *compare id. with* ECF No. 20 at 1-3, it is not necessary to wade into this legal thicket. Whether or not Mountaire's product could be retroactively deemed adulterated has no bearing on the application of either the reasonable expectation or foreign-natural test. Although a determination that its product was adulterated could subject Mountaire to liability under the PPIA or, potentially, for negligence, *see Craten*, 305 F. Supp. 3d at 1064, it would not establish strict liability or liability for breach of implied warranties. *See id.* at 1060, 1064.

7

itself. Under the economic loss doctrine, "courts do not permit tort recovery for a defective product's damage to itself or, in other words, where the injury suffered is merely the failure of the product to work properly rather than personal injury or resulting injury to other property." *Fireman's Fund Ins. Co. v. Childs*, 52 F. Supp. 2d 139, 142 (D. Me. 1999); *see also Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc.*, 659 A.2d 267, 270-71 (Me. 1995) (adopting the economic loss doctrine in Maine for product liability claims).

Starr alleges damages in excess of ten million dollars, "including but not limited to return and destruction of the recalled chicken products, lost sales opportunities, loss of business, and loss of customers." ECF No. 1-3 at ¶ 20. Additionally, at the hearing in this case, Starr asserted that there was harm flowing from the product recall and associated costs. Economic loss includes "damages for inadequate value, costs of repair and replacement of defective product, or consequent loss of profits—without claim of personal injury or damage to other property." *Fireman's Fund*, 52 F. Supp. 2d at 142 (quoting *Oceanside*, 659 A.2d at 270 n.4) (internal quotation marks omitted). Accordingly, the damages alleged by Starr fall within the ambit of the economic loss doctrine. Further, costs associated with product recalls are purely economic and thus barred by the economic loss doctrine. *See e.g., Medefil, Inc. v. Scientific Protein Labs*, LLC, No. 13-cv-04773, 2015 WL 3962820, at *3 (N.D. Ill. June 26, 2015) ("costs associated with [product] recall . . . loss of profits and sales . . . were barred by the economic loss doctrine."); *Aliki Foods, LLC v. Otter Valley Foods, Inc.,* 726 F. Supp. 2d 159, 167-68 (D. Conn. 2010) (holding that the product recall associated with defective, frozen food product containing

Listeria was barred by the economic loss doctrine because the Complaint had not sufficiently alleged damaged to other property).

Because the Complaint does not allege facts plausibly identifying other sources of loss in addition to financial losses barred by the economic loss doctrine, Starr has not asserted a viable strict liability claim.

## IV. CONCLUSION

For the foregoing reasons, Mountaire's Motion to Dismiss (ECF No. 18) is **GRANTED** and the Complaint is dismissed.

**SO ORDERED.**

**Dated this 2nd day of August, 2018.**

                                          **/s/ JON D. LEVY**
                                          **U.S. DISTRICT JUDGE**